**In re Charles P. MORRIS, Kenneth L. Pottebaum, and John D. Stricklin.**

**No. 96–1425.**

United States Court of Appeals, Federal Circuit.

Decided Sept. 10, 1997.

Rehearing Granted with no change in result and in banc suggestion declined Sept. 22, 1997.

Richard H. Stern, Ablondi, Foster, Sobin & Davidow, Washington, DC, for appellants. Of counsel are Bill D. McCarthy, Randall K. McCarthy, Phillip L. Free, Jr., McCarthy & Associates, Inc., Oklahoma City, OK, and Edward P. Heller, III, Seagate Technology, Inc., Scotts Valley, CA.

Nancy J. Linck, Solicitor, Patent and Trademark Office, U.S. Department of Commerce, Arlington, VA, for appellee. Of counsel are Albin F. Drost, Deputy Solicitor, Kenneth R. Corsello and David J. Ball, Jr., Associate Solicitors.

## ORDER

Appellants Morris *et al.* petition for rehearing of the decision of this court issued under date of August 18, 1997. Appellants point to several statements in the issued opinion which, in their view, entitle them to rehearing of their appeal. After thorough review of the petition, the court grants the petition for rehearing for the limited purpose of laying to rest any doubts about the court's views as expressed in the opinion; the judgment affirming the decision of the Board is reaffirmed.

SO ORDERED.

Before PLAGER, CLEVENGER, and BRYSON, Circuit Judges.

## REVISED OPINION

PLAGER, Circuit Judge.

Appellants Morris, Pottebaum, and Stricklin appeal from a decision of the Board of Patent Appeals and Interferences in Application Ser. No. 07/673,967, dated March 28, 1996. In that decision the Board affirmed a rejection of appellants' claims 1, 5 and 20 under 35 U.S.C. § 102(b). Because the Board did not err in its reading of appellants' claims, we affirm.

## BACKGROUND

On March 22, 1991, appellants filed a patent application entitled "Acoustic Isolator for a Disc Drive Assembly." The application was assigned Ser. No. 07/673,967 by the United States Patent and Trademark Office

("PTO") and prosecution of the application proceeded.

The problem addressed in the application was the acoustic noise generated by a disc drive as a result of the physical movement of the internal motors. According to the application, modern disc drives such as used in personal computers include two motors, also referred to as "excitation sources." The first is a spindle motor that spins the magnetic discs upon which data is stored. The second is an actuator motor that moves a read/write head across the discs to access specific locations or "tracks" on the discs. These motors are mounted in a disc housing. The housing is typically comprised of an upper and a lower housing cover that mate together to enclose the entire disc drive. The problem described in the application is that any vibration of the motors is transmitted to the housing by virtue of the connection of the motors to the housing. This causes the housing to vibrate in sympathy with the motors, particularly if the resonant frequency of the motor corresponds to the natural frequency of either of the housing covers.

Prior art solutions addressed this problem by adding an isolator between the motors and the housing. For example, United States Patent No. 4,491,888 (the "Brown" patent) taught the use of an annular elastomeric pad to absorb the vibrations. As described and shown in Brown, the "elastomeric member or pad 100 is engaged between the base plate [32] and lower casing [12] . . . to assist in dampening actuator-induced vibrations." Brown, Col. 7, lines 32–47. Figure 2 of Brown, showing a cross-section of the pad 100 and surrounding housing 12, is reproduced below.

FIG. 2

The disadvantage of Brown, according to appellants, was that it required an additional part. This may not seem significant to those unfamiliar with the disc drive industry, but, in the cost-sensitive and constantly miniaturizing world of disc drive manufacturers, additional pieces of equipment add to the cost of the disc drive and consume valuable real estate in the drive.

Appellants' approach was different from the approach taken in Brown. Instead of adding an additional part, appellants thinned down a portion of the motor casing in the area where the motor attached to the casing. This thinned-down area, referred to as a "compliance area," absorbs most of the kinetic energy produced by the motor because of its reduced thickness, without radiating that energy outward to the remainder of the housing. Appellants maintained in their application that acoustic noise can be significantly reduced using this approach, and without additional parts.

Figure 3 of the appellants' application, reproduced below, shows a partially detailed cross-sectional view of a disc drive according to their invention. The disc drive includes a top housing cover 12A and a bottom housing cover 14A. A motor 16 is attached to the top and bottom covers by screws 32A. A portion of the top and bottom covers 50A is thinned-down in an area extending radially away from the screws 32A. This "compliance area,"

due to its reduced thickness relative to the remaining housing, achieves the acoustic noise reduction of the applicants claimed invention.

The application included 22 claims. Original claim 1 read:

1. An improved acoustic isolation apparatus for reducing the acoustic noise produced by a system having at least one excitation source disposed so as to impart vibrations to a structure member coupled thereto, the acoustic isolation apparatus comprising:

at least one acoustic isolator providing determined compliance of the structure member in a selected area of compliance disposed to impede coupling of the vibrations of the excitation source and the structure member.

In a first office action, claim 1 was rejected as being anticipated under 35 U.S.C. § 102(b) in view of appellants' admitted prior art and also in view of Brown.[1] The admitted prior art was essentially identical to applicant's Figure 3, shown above, but the "compliance area" amounted to a counter-

sink hole simply big enough to receive the head of the screw 32A.

In response to this rejection, appellants amended claim 1 as follows, with language removed enclosed in square brackets and language added underlined:

1. (Amended) An improved acoustic isolation apparatus for reducing the acoustic noise produced by a system having at least one excitation source disposed so as to impart vibrations to a [structure] support member coupled thereto, the acoustic isolation apparatus comprising:

at least one acoustic [isolator providing determined compliance of the structure member in] compliance area integrally formed on a selected area of [compliance disposed] the support member so as to impede coupling of the vibrations of the excitation source [and] to the [structure] support member.

---

1. All of the other claims were also rejected on the same grounds. Because all of the appealed claims stand or fall with claim 1, we will confine our discussion to the prosecution history of claim 1.

In addition, appellants argued that Brown is distinguishable because it "does not teach or suggest an acoustic isolator apparatus which is integrally formed as part of the housing." The appellants then went on to describe Brown in general terms and concluded that "it is clear that the base plate and housing arrangement disclosed in Brown '888 is completely different in structure than the acoustic isolator apparatus recited in Applicants' claims 1–22, as amended."

In response to appellants' amendment and related arguments, the examiner entered a new ground of rejection. Claim 1 was rejected under the same section of the statute, Section 102(b), but using a different reference, Biermeier et al., U.S. Patent No. 4,780,-777. Biermeier showed a thin, substantially horse-shoe shaped resilient section adjacent the spindle of the drive shaft in a disc drive housing to provide a support for the spindle of a disc and to achieve bearing preload. Biermeier, Col. 4, lines 53–68. According to the examiner, Biermeier showed "a resilient wall region 15 integrally formed on the housing 1 which would impede coupling of vibrations of the excitation source 38 to the support member 1 while maintaining rigidity of the housing assembly." The examiner further stressed that Biermeier does show "an acoustic isolator apparatus which is *integrally formed* as part of the housing."

The appellants responded by once again amending their claim and by attempting to distinguish the cited reference. Claim 1 after this second amendment read:

1. (Twice Amended) An improved acoustic isolation apparatus for reducing the acoustic noise produced by a system having at least one excitation source [disposed so as to impart vibrations] attached at a contact point to a support member, the acoustic isolation apparatus comprising:

at least one acoustic compliance area integrally formed on a selected area of the support member so as to impede selected frequencies of acoustic noise resulting from the coupling of the vibrations of the excitation source to the support member, the acoustic compliance area formed on the support member such that increased compliance is provided to the support member substantially surrounding the contact point.

Appellants vigorously contested the examiner's assertion that the Biermeier resilient section achieved any acoustic reduction. If Biermeier achieved any acoustic reduction, according to appellants, "it was pure happenstance."

After considering the amendment and related arguments, the examiner shifted back to his original ground for rejection—Brown. In a third office action, the examiner again rejected claim 1 as being anticipated by Brown under Section 102(b). According to the examiner, "Brown et al show an acoustic compliance area 100 integrally formed *on* a selected area of the support member 12 so as to impede selected frequencies of acoustic noise resulting from the coupling of the vibrations of the excitation source 92 to the support member 12." The examiner considered the appellants' arguments with respect to Biermeier moot in view of the new ground of rejection.

A third amendment to claim 1 followed. The amended claim 1 now read:

1. (Thrice Amended) An improved acoustic isolation apparatus for reducing the acoustic noise produced by a system having at least one excitation source attached at a contact point to a support member, the acoustic isolation apparatus comprising:

at least one acoustic compliance area integrally formed [on] as a portion of a selected area of the support member so as to impede selected frequencies of acoustic noise resulting from the coupling of the vibrations of the excitation source to the support member, the acoustic compliance area formed [on] as a portion of the support member such that [increased compliance is provided to] the support member has increased compliance substantially surrounding and extending radially about the contact point.

Appellants tried to distinguish Brown on the ground that the patent "does not teach or suggest an acoustic isolator apparatus which is 'integrally formed as a portion of' the

housing." Moreover, according to appellants, Brown failed to accomplish the main objectives of the invention, that of reducing space and parts requirements. Because the acoustic compliance area of the claimed invention is "integrally formed as a portion of the support member," appellants argued their claimed invention achieves the goal of reducing acoustic noise without the concomitant disadvantages of Brown.

The examiner was unpersuaded. Accordingly, he made the rejection final.[2] *See* 37 C.F.R. § 1.113. In the final rejection the examiner reiterated his position that "the language 'integrally formed as a portion of' (e.g. a selected area, the housing assembly or the support member) still reads on the acoustic compliance area 100 of Brown et al."

Dissatisfied with the examiner's rejection, appellants appealed to the Board of Patent Appeals and Interferences. The Board framed the issue presented on appeal as "the propriety of the examiner's considering the elastomeric pad 100 formed of foam rubber and best shown in figures 2 and 3 of Brown as comprising the claimed acoustic compliance area of a support member or of a housing." Appellants argued before the Board that the elastomeric pad 100 of Brown is neither "integrally formed" nor "a portion of" the housing assembly to which it is attached, as those terms are used in appellants' patent application. Appellants urged that the proper interpretation of the disputed language in their proposed claim, in light of the specification, required the examiner to limit the scope of the claim to a thinned-down portion of a housing. The Board disagreed and therefore affirmed the examiner's rejection.

The Board cited numerous CCPA decisions including *In re Kohno*, 55 C.C.P.A. 998, 391 F.2d 959, 157 USPQ 275 (CCPA 1968), *In re Dike*, 55 C.C.P.A. 1172, 394 F.2d 584, 157 USPQ 581 (CCPA 1968), *In re Larson*, 52 C.C.P.A. 930, 340 F.2d 965, 144 USPQ 347 (CCPA 1965), and *In re Clark*, 41 C.C.P.A. 974, 214 F.2d 148, 102 USPQ 241 (CCPA 1954), in which the term "integral" had been given a broader meaning than that advanced by the appellants. According to the Board, "the term 'integral' is a relatively broad term inclusive of means for maintaining parts in a fixed relationship as a single unit." The appellants' interpretation, according to the Board, impermissibly required them to read limitations of the specification into the appealed claims. Under the proper interpretation of the disputed language, the Board concluded that the examiner correctly rejected claim 1 as being anticipated by Brown. This appeal followed.

### DISCUSSION

As a preliminary matter the parties disagree about the proper claim construction methodology to be employed by the PTO. Appellants argue that this court's *in banc* decisions in *Markman v. Westview Instruments*, 52 F.3d 967, 34 USPQ2d 1321 (Fed. Cir.1995) (in banc), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577, 38 USPQ2d 1461 (1996), and in *In re Donaldson*, 16 F.3d 1189, 29 USPQ2d 1845 (Fed.Cir.1994) (in banc), require the PTO in the course of prosecution to interpret claims in the same manner as courts are required to during infringement proceedings. The Solicitor responds by arguing that our past decisions permit the PTO to give claim language its "broadest reasonable interpretation" during prosecution, cit-

---

**2.** The examiner did, however, allow claims 10–19 and 23 and merely objected to claim 21. Claim 10, for example, reads:

    10. An improved acoustic isolation apparatus for a disc drive assembly having an external housing with a lower surface and a top surface, the disc drive assembly including at least one excitation source secured to and between the lower and top surfaces of the housing at contact points, whereby vibration of the excitation source is coupled to the housing to cause the housing to vibrate so as to create acoustic noise, the improved acoustic isolation apparatus comprising:

    at least one high compliance area formed as a portion of one of the surfaces of the housing which surrounds and extends radially about the contact point on said surface, the high compliance area having a thickness substantially less that the thickness of the remainder of the surface, the high compliance area minimizing the passage of the excitation source vibrations from the contact point to the remainder of the surface so that overall acoustic noise is reduced thereby.

ing *In re Zletz,* 893 F.2d 319, 13 USPQ2d 1320 (Fed.Cir.1989), *In re Yamamoto,* 740 F.2d 1569, 222 USPQ 934 (Fed.Cir.1984), and *Burlington Indus. v. Quigg,* 822 F.2d 1581, 3 USPQ2d 1436 (Fed.Cir.1987).

■ The Solicitor is correct, and we reject appellants' invitation to construe either of the cases cited by appellants so as to overrule, *sub silentio,* decades old case law. Some cases state the standard as "the broadest reasonable interpretation," *see, e.g., In re Van Geuns,* 988 F.2d 1181, 1184, 26 USPQ2d 1057, 1059 (Fed.Cir.1993), others include the qualifier "consistent with the specification" or similar language, *see, e.g., In re Bond,* 910 F.2d 831, 833, 15 USPQ2d 1566, 1567 (Fed. Cir.1990). Since it would be unreasonable for the PTO to ignore any interpretive guidance afforded by the applicant's written description, either phrasing connotes the same notion: as an initial matter, the PTO applies to the verbiage of the proposed claims the broadest reasonable meaning of the words in their ordinary usage as they would be understood by one of ordinary skill in the art, taking into account whatever enlightenment by way of definitions or otherwise that may be afforded by the written description contained in the applicant's specification.

Had either of the cases cited by appellants intended to make the dramatic shift in our jurisprudence suggested by appellants one can safely assume they would have done so explicitly. We need not, however, rely solely on assumption or inference. Both cases are readily distinguishable from the present case. The first, *Markman,* involved an infringement suit in the district court. This is a distinction with a difference. Patents in infringement suits are presumed valid by statute. 35 U.S.C. § 282 (1994). No such presumption attaches before the PTO.[3] It is the PTO's duty to assure that the statutory requirements for patentability are met. *See* 35 U.S.C. § 131 (1994). These requirements include 35 U.S.C. §§ 101 (utility), 102 (novelty), § 103 (nonobviousness), § 112 ¶1 (enablement, written description, and best mode)

and § 112 ¶2 (particularly point out and distinctly claim).

■ It would be inconsistent with the role assigned to the PTO in issuing a patent to require it to interpret claims in the same manner as judges who, post-issuance, operate under the assumption the patent is valid. The process of patent prosecution is an interactive one. Once the PTO has made an initial determination that specified claims are not patentable (the prima facie case concept, *see In re Oetiker,* 977 F.2d 1443, 1448, 24 USPQ2d 1443, 1447 (Fed.Cir.1992) (Plager, J. concurring)), the burden of production falls upon the applicant to establish entitlement to a patent. *See In re Spada,* 911 F.2d 705, 708, 15 USPQ2d 1655, 1658 (Fed.Cir.1990); *In re King,* 801 F.2d 1324, 1327, 231 USPQ 136, 138 (Fed.Cir.1986) (burden shifts to appellant after the PTO establishes a *prima facie* case of anticipation). This promotes the development of the written record before the PTO that provides the requisite written notice to the public as to what the applicant claims as the invention. As the Supreme Court recently affirmed, public notice is an important objective of patent prosecution before the PTO. *See Warner–Jenkinson Co. v. Hilton Davis Chem. Co.,* —— U.S. ——, ——, 117 S.Ct. 1040, 1051, 137 L.Ed.2d 146 (1997) (establishing a rebuttable presumption of prosecution history estoppel when the public record is unclear as to whether the prior art precipitated an amendment to the claims in order to give "proper deference to the role of claims in defining an invention and providing public notice.").

Although *In re Donaldson* comes closer to the present case, it still fails to prove appellants' point. In *Donaldson,* this court considered the question of how the PTO was required to interpret claims drafted pursuant to 35 U.S.C. § 112 ¶6, claims in so-called "means-plus-function" language. *See* 35 U.S.C. § 112 ¶6 (1994) ("An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of the structure,

---

**3.** Despite the language in Section 102, there is no such presumption before the issuance of a patent. *Compare* 35 U.S.C. § 102 ("A person shall be entitled to a patent unless . . . .") *with* 35 U.S.C. § 282 ("A patent shall be presumed valid."). The presumption does not attach until a patent has issued.

material, or acts in support thereof.")". The PTO argued that they were permitted to interpret the claims as broadly as the claim language permitted without the constraint of the written description contained in the specification. The *Donaldson* court, *in banc,* noted that the statute requires that claims so written "shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." *Donaldson,* 16 F.3d at 1193, 29 USPQ2d at 1848–49. The court found no basis in the statute or legislative history for exempting the PTO from this statutory mandate. Therefore the PTO is required to consult the specification during examination in order to determine the permissible scope of the claim.

It is enough to point out that this case does not involve claims written in means-plus-function language to distinguish *Donaldson* from the present case. There is no comparable mandate in the patent statute that relates the claim scope of non-§ 112 ¶ 6 claims to particular matter found in the specification. *See Eastman Kodak Co. v. Goodyear Tire & Rubber Co.,* 114 F.3d 1547, 1552, 42 USPQ2d 1737, 1740 (Fed.Cir.1997) ("The claim language itself defines the scope of the claim.").

We need not simply rely on this distinction, however, for the *Donaldson* court went on to dispose of the precise argument that appellants now make. The PTO had argued that our prior case law, as discussed above, permitted examiners to give claims their "broadest reasonable interpretation" during prosecution. *See, e.g., In re Prater,* 56 C.C.P.A. 1381, 415 F.2d 1393, 1404–05, 162 USPQ 541, 550–51 (CCPA 1969). Limiting claims written in accordance with § 112 ¶ 6 to what is described in the specification and equivalents thereof, according to the PTO, would conflict with this practice. *Donaldson* itself pointed out that the court's holding is readily harmonized with that principle. Requiring the PTO to interpret claims in light of the specification "merely sets a limit on how broadly the PTO may construe means-plus-function language under the rubric of 'reasonable interpretation.'" *Donaldson,* 16 F.3d at 1194, 29 USPQ2d at 1850. There-

fore, it cannot reasonably be argued that *Donaldson* overruled our long line of case law that permits the PTO to give claims their "broadest reasonable interpretation."

■ The question then is whether the PTO's interpretation of the disputed claim language is "reasonable." Appellants contend that the Board's interpretation is unreasonable when the claim language is properly construed in light of the specification and other extrinsic evidence. In particular, appellants argue that the phrase "integrally formed as a portion of" requires the compliance area to be "fused together" with the housing "to form a single part—such as by casting them as a molded article, machining a single piece of material to form them, welding them together, or otherwise joining them in a firm and substantially permanent manner." Brief for Appellants at 18. Because the elastomeric pad of Brown is "removably coupl[ed]," according to appellants, Brown does not anticipate claim 1 when properly construed. *Id.*

The examiner stated in his third rejection that he interpreted the phrase "integrally formed as a portion of a selected area of the support member" to read on Brown. By this the examiner clearly meant that he interpreted the phrase "integrally formed" to encompass devices that had a compliance area fixedly attached to a support member, as in Brown. The examiner reiterated this interpretation in the final rejection. "It is the Examiner's position that the language 'integrally formed as a portion of' (e.g. a selected area, the housing assembly or the support member) still reads on the acoustic compliance area 100 of Brown et al." The Board also adopted this interpretation citing numerous cases in which the word "integral" had been interpreted broadly to encompass multi-piece structures.

We conclude that the PTO's interpretation is reasonable in light of all the evidence before the Board. As the cases cited above demonstrate, our predecessor court had on several prior occasions interpreted the term "integral" to cover more that a unitary construction. *See, e.g., In re Kohno,* 55 C.C.P.A. 998, 391 F.2d 959, 157 USPQ 275 (CCPA 1968), *In re Dike,* 55 C.C.P.A. 1172, 394 F.2d

584, 157 USPQ 581 (CCPA 1968), *In re Larson*, 52 C.C.P.A. 930, 340 F.2d 965, 144 USPQ 347 (CCPA 1965), and *In re Clark*, 41 C.C.P.A. 974, 214 F.2d 148, 102 USPQ 241 (CCPA 1954). This court has also endorsed that interpretation. *See, e.g., Advanced Cardiovascular Sys. v. Scimed Life Sys.*, 887 F.2d 1070, 1074, 12 USPQ2d 1539, 1542 (Fed. Cir.1989) (nothing of record limited "integral" to mean "of one-piece" construction). Appellants' attempt to distinguish these cases misses the point. Absent an express definition in their specification, the fact that appellants can point to definitions or usages that conform to their interpretation does not make the PTO's definition unreasonable when the PTO can point to other sources that support its interpretation.

Appellants argue that their claim does not just require that the acoustic compliance area be integrally formed from the support member. Instead, claim 1 requires that the area be "integrally formed *as a portion of*" the support member. This does not change our conclusion. Portion is defined as a "part or share of something." *Webster's Third New International Dictionary* 1768 (1986). Thus this term tells us nothing about whether the acoustic compliance area is removable or separable from the support member. A slice of pie can be considered a 'portion of' the pie while also being removable. We conclude that the added limitation does not overcome the rejection.

The appellants urge us to consult the specification and some of the cited prior art, including Brown, and interpret the disputed language more narrowly in view thereof. When read in light of this material, according to applicants, the "true" meaning of the phrase emerges. We decline to attempt to harmonize the applicants' interpretation with the application and prior art. Such an approach puts the burden in the wrong place. It is the applicants' burden to precisely define the invention, not the PTO's. *See* 35 U.S.C. § 112 ¶ 2 ("The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."). While it is true that the claims were not rejected on the ground of indefiniteness, this section puts the burden of precise claim drafting squarely on the applicant.

The problem in this case is that the appellants failed to make their intended meaning explicitly clear. Even though the appellants implore us to interpret the claims in light of the specification, the specification fails to set forth the definition sought by the appellants. Nowhere in the technical description of the invention does the application use or define the phrase "integrally formed." The phrase briefly appears in the "Summary of the Invention" and again in a description of the "advantages of the present invention." In neither case is a drawing referenced or a precise definition given.

The prosecution history is equally unhelpful in divining the interpretation sought by appellants. In all cases the appellants first describe their invention followed by a general description of the prior art reference. They then conclude with a conclusory statement such as "[I]t is clear that Applicants' inventive concept, as recited in claim 1 (amended), is not anticipated by the prior art," or, even more vaguely, "it is clear that the base plate and housing arrangement disclosed in Brown '888 is completely different in structure than the acoustic isolator apparatus recited in Applicants' claims." Never do appellants particularly distinguish their *claimed* invention (as compared with their "inventive concept," whatever that means) from the prior art. We interpret this as a veiled attempt to avoid the potential future effects of prosecution history estoppel. Such evasiveness we cannot condone, particularly when the public must rely on the written record to define the resulting property right. *See Warner–Jenkinson,* —— U.S. at ——, 117 S.Ct. at 1040.

We understand the difficulties that can arise in prosecution. This appeal is a case in point. The PTO initially rejected claim 1 in light of Brown. Appellants amended their claim to add the limitation that the compliance area was "integrally formed on" the support member. This amendment seemed to overcome the examiner's rejection because in response the examiner produced a new ground for the rejection (i.e., Biermeier). That reference showed a thinned-down re-

gion of a supporting top member. The examiner's own actions suggested that the applicants had properly distinguished Brown on the ground that the Brown pad was not "integrally formed" from the support member, which necessitated the new ground of rejection.

Appellants were apparently able to overcome this new rejection by adding the further limitation that the acoustic isolator .eliminated "selected frequencies of acoustic noise" and arguing that Biermeier did not accomplish this claimed function. At this point the applicants had no reason to believe that Brown could properly be the basis for a 102 rejection, having previously distinguished it as well as Biermeier. When the examiner renewed his previous ground of rejection based on Brown, the appellants were no doubt of the view that Brown was distinguishable. Nonetheless, they made their third and final amendment, adding the limitation that the acoustic compliance area be integrally formed "as a portion of" the support member, in an attempt to assuage the examiner. Surely they must have thought this amendment would distinguish Brown, and reasonably so given what had previously transpired. Unfortunately they were mistaken.

■ Nonetheless, when the examiner renewed the rejection the applicants had an obligation to either demonstrate that the examiner's interpretation of the claim language was unreasonable or amend their claim to distinguish the prior art. This they did not do. It is apparent that the appellants knew how to claim their invention so as to avoid the prior art since several claims were allowed, some very similar to claim 1. The PTO was not only permitted but obligated to reject claim 1 when appellants failed precisely to define in the written description the disputed language, and there was a reasonable alternative definition.

The decision of the Board is

*AFFIRMED.*

### COSTS

Each party to bear its own costs.